**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

CARLOPI THOMASIAN,                        )
                                          )
                Plaintiff,                )    No. 03:12-cv-01435-HU
                                          )
        v.                                )
                                          )
WELLS FARGO BANK, N.A.; TRANS             )    **FINDINGS & RECOMMENDATIONS ON**
UNION, LLC; EXPERIAN INFORMATION)              **MOTION FOR SUMMARY JUDGMENT**
SOLUTIONS, INC.; and EQUIFAX              )
INFORMATION SERVICES, LLC;                )
                                          )
                Defendants.               )

_____

Justin M. Baxter
Michael C. Baxter
Baxter & Baxter, LLP
8835 S.W. Canyon Lane
Suite 130
Portland, OR 97225-3429

        Attorneys for Plaintiff


Pilar C. French
Robert E. Maloney, Jr.
Kristen L. Tranetzki
Anthony M. Stark
Lane Powell, PC
601 S.W. Second Avenue
Suite 2100
Portland, OR 97204-3158

        Attorneys for Defendant Wells Fargo Bank, N.A.


1  - FINDINGS & RECOMMENDATIONS

HUBEL, Magistrate Judge:

This is an action for violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"). The plaintiff Carlopi Thomasian claims the defendant Wells Fargo Bank N.A. ("Wells Fargo") violated the FCRA by failing to conduct a reasonable investigation of Mrs. Thomasian's claim that she is not a joint obligor on a credit card account (the "Account"), and failing to correct or remove the allegedly false report after Wells Fargo determined, according to Mrs. Thomasian, that it could not verify Mrs. Thomasian was a joint obligor on the Account.[1] *See* Dkt. #1, Complaint. Mrs. Thomasian claims the continued reporting of the Account on her credit report has caused her to suffer "denials of credit, worry, fear, distress, frustration, damage to reputation, embarrassment, humiliation, and lost opportunity to obtain credit." Dkt. #1, Complaint, ¶¶ 13, 21, 27, & 34. She seeks economic and non-economic damages, statutory damages, punitive damages, and statutory attorney's fees.

The case is before the court on Wells Fargo's motion for summary judgment, Dkt. #66. The motion is fully briefed, and the court heard oral arguments on the motion on December 16, 2013. The undersigned submits the following findings and recommended disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B).

/ / /

/ / /

---

[1]Mrs. Thomasian also sued the three major credit reporting agencies: Trans Union LLC; Experian Information Solutions, Inc.; and Equifax Information Services, LLC. Mrs. Thomasian has settled her claims against each of those defendants.

2   - FINDINGS & RECOMMENDATIONS

# I. *SUMMARY JUDGMENT STANDARDS*

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)).

The Ninth Circuit Court of Appeals has described "the shifting burden of proof governing motions for summary judgment" as follows:

> The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S. Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 528 (1986). In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be

1    drawn in its favor.  *Id.* at 255, 106 S. Ct.
2    2505.

3  *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th
4  Cir. 2010).

### *II.  BACKGROUND FACTS*

6    The Account was opened in 1999.  Mrs. Thomasian and her
7  husband claim Mr. Thomasian opened the Account alone, and it was
8  his individual account.  Wells Fargo claims its records indicate
9  the Account was opened as a joint account, with Mrs. Thomasian and
10  her husband as the joint account holders and co-obligors on the
11  Account.  Wells Fargo reported the Account as a joint account from
12  its inception forward, and issued credit cards bearing the names
13  "Thomas Thomasian" and "Carlopi Thomasian" on three occasions (at
14  the time the Account was opened, and on two renewal dates) between
15  1999 and 2011.  Wells Fargo sent credit card statements to the
16  Thomasians' home each month during that time period, and Wells
17  Fargo claims each of those statements bore Mrs. Thomasian's name as
18  a joint account holder.  In 2011, Mr. Thomasian filed an individual
19  petition for bankruptcy.  He received a discharge that included the
20  unpaid balance on the Account in excess of $11,500.  When Wells
21  Fargo then began attempting to collect the outstanding balance on
22  the Account from Mrs. Thomasian, she disputed that she was ever a
23  joint owner or obligor of the Account.

24    Mrs. Thomasian filed notices of her dispute with each of the
25  major credit reporting agencies ("CRAs").  Pursuant to the FCRA,
26  the CRAs contacted Wells Fargo to request verification of the
27  Account.  *See* Dkt. #71, Decl. of Maria Reeves, & Exs. 1-7.  Wells
28  Fargo investigated its records, and concluded Mrs. Thomasian was,

4  - FINDINGS & RECOMMENDATIONS

in fact, obligated on the Account.  Wells Fargo relied on informa-
tion in its records in reaching this conclusion.  Information upon
which Wells Fargo relied, and the Thomasians' responses to that
information, includes the following:

1.    Although Wells Fargo no longer has the paper application
submitted to open the Account, its electronic records show
that Mrs. Thomasian's driver's license number was obtained at
the time the Account was opened.

In his deposition, Mr. Thomasian testified he would not
have provided his wife's driver's license number or other
personal information to the bank.  However, he further testi-
fied that any information in connection with the Account that
relates to his wife would have to have come from him.
Mr. Thomasian insisted his wife was not involved in filling
out the application for the credit card, and he stated, "I
know I did not apply [for a] card for her."  Dkt. #68-1, ECF
p. 13.  Mr. Thomasian also testified that when the credit
cards were sent out after the Account was opened, and
Mrs. Thomasian saw that her name was on one of the cards, she
became angry with her husband because she did not want to use
credit cards.  *Id.*  Mrs. Thomasian put the card in her filing
cabinet, never activated the card, and just forgot about it.
She does not recall receiving any new cards after the first
card expired.  Dkt. #68-2, ECF pp. 27-30.  Taking the facts in
the light most favorable to Mrs. Thomasian, as the non-moving
party, the court finds there is a disputed issue of material
fact as to whether Mrs. Thomasian participated in applying for

the Account, or acquiesced in being considered as a joint account holder or obligor on the Account.

2.   Wells Fargo issued cards in Mrs. Thomasian's name on three occasions - at the inception of the Account, and on two renewal dates when the cards expired.   The cards were never returned to Wells Fargo by Mrs. Thomasian.   Dkt. #67, ECF p. 8.

Mrs. Thomasian responds that she understood Wells Fargo "had issued a courtesy card" to her, but she never used the card, and "did not make anything of the inclusion of [her] name on the statements." Dkt. #80, ECF p. 2.  Mrs. Thomasian reiterates her claim that neither she nor her husband ever applied for a joint account, and she never agreed to be an obligor on the Account.  *Id.*

3.   Wells Fargo sent the Thomasians a credit card statement bearing Mrs. Thomasian's name each month.   In addition, the bank sent a separate monthly portfolio statement that included the Thomasians' joint checking account statement, a brief summary of the Account's status, and a "rewards" statement related to the Account.

In Mrs. Thomasian's deposition, she testified that she reviewed the joint checking account statement each month to check it for accuracy. Dkt. #68-2, ECF p. 9. As part of that review, she sometimes noticed the "rewards summary" related to the credit card.  However, she never worried about the inclusion of her name on the statement because she knew neither she nor her husband had applied for a joint credit card account.

1   Thus, she "had no reason to dispute the inclusion of [her]
2   name on the statements." Dkt. #80, ECF p. 2.
3   4.   Wells Fargo's records indicate that on August 7, 2001,
4   Mrs. Thomasian called the bank to discuss something about the
5   Account, and, according to Wells Fargo, Mrs. Thomasian "was
6   verified as a cardholder." Dkt. #67, ECF p. 8; Dkt. #69-1,
7   ECF p. 19; see Dkt. #68-2, ECF pp. 7-8.

8       Mrs. Thomasian testified, in her deposition, that she did
9   not recall the telephone call, although it was possible her
10  husband had asked her to "call and try to get the reward."
11  Dkt. #68-2, ECF p. 7. At best, this evidence shows only that,
12  as noted above, Wells Fargo considered Mrs. Thomasian to be a
13  joint account holder on the Account; it does not establish
14  Mrs. Thomasian considered herself to be a co-obligor on the
15  Account, or that she actually was a co-obligor.

16  5.   Mrs. Thomasian made a payment on the Account by check
17  dated October 23, 2003, in the amount of $71.50. See Dkt.
18  #69-4. Wells Fargo notes this amount was the same as a charge
19  to "Pre Enroll Inc." dated September 24, 2003, rather than the
20  amount of the outstanding balance on the Account of $41.09.
21  See Dkt. #69-5. Wells Fargo includes this fact in the section
22  of its brief listing Mrs. Thomasian's "use and benefit from
23  the [Account]." Dkt. #67, ECF p. 14. Wells Fargo also lists
24  charges made on the Account that allegedly benefitted
25  Mrs. Thomasian. These included the purchase of a course in
26  advanced real estate practices which Mrs. Thomasian attended;
27  the purchase of a sofa for the Thomasians' home; charges for
28  service and insurance related to Mrs. Thomasian's vehicle;

charges at stores where Mrs. Thomasian testified she shops; charges to a dentist Mrs. Thomasian and her family have visited; and a cash advance that was deposited into the Thomasians' joint checking account. *Id.*, pp. 14-15. In addition, Wells Fargo notes that "[o]n October 31, 2008, two rewards checks were issued from the Account and deposited into the [Thomasians'] joint checking account." *Id.*, p. 15.

For purposes of Wells Fargo's motion for summary judgment, the only reasonable inference the court draws from the evidence of these charges and the one payment is that Mrs. Thomasian had knowledge of the Account's existence at the time the payment was made. A credit card holder may purchase a gift or service for a friend or relative, without the recipient thereby incurring liability on the credit card account. Similarly, writing a check to make a payment on the Account does not necessarily make the check writer a joint obligor on the credit card account.

According to Wells Fargo, Mrs. Thomasian initially contacted Wells Fargo by telephone on July 22, 2011, to dispute her liability for the Account. Wells Fargo told Mrs. Thomasian "that she had been the secondary obligor and had become the primary after her husband's bankruptcy." *Id.* Mrs. Thomasian contacted Wells Fargo again on August 9, 2011, claiming she never applied for the card. *Id.* Mrs. Thomasian wrote a letter to Wells Fargo dated August 13, 2011, stating, in pertinent part, as follows:

> I recently received a collection phone call from Wells Fargo regarding [a] past due balance ($11,900) on a credit card account[.]

8 - FINDINGS & RECOMMENDATIONS

1
2
3

> Please be informed that this is not my Credit
> Card and the balance on it is not my respon-
> sibility.  I did not request the credit card,
> I did not activate the credit card, and I did
> not charge anything to this credit card.

4
5

> This card belongs to my husband Tom Thomasian.
> I had no knowledge of this card as he used it
> mainly for his business.

6
7
8

> I am not associated with this account in any
> way and request you remove my name from your
> data base.  Please do not make any further
> collection calls to me regarding this account.

9 Dkt. #69-7.  Wells Fargo deemed Mrs. Thomasian's letter a "cease

10 and desist" letter, and, according to Wells Fargo, it "ceased

11 collection calls on the Account."  Dkt. #67, ECF p. 15.  Wells

12 Fargo apparently sent Mrs. Thomasian an automated letter to that

13 effect, which she received on August 31, 2011.  *See* Dkt. #69-8.

14     On September 15, 2011, Mrs. Thomasian sent another letter to

15 Wells Fargo, in response to the automated letter she had received.

16 She again stated she had nothing to do with the Account, and she

17 made two requests: (1) that Wells Fargo provide her with proof of

18 her signature to show she "requested this credit card and agreed to

19 the terms and conditions associated with it," and (2) to make any

20 further communications with her in writing.  *Id.*

21     Mrs. Thomasian's letter was referred to John Bradley, a Wells

22 Fargo employee in the "Card Operations Executive Office."  Bradley

23 investigated the bank's electronic records of the Account's

24 history, and responded to Mrs. Thomasian, in pertinent part, as

25 follows:

26
27
28

> Your account was opened on September 30, 1999
> using an electronic application submitted via
> the password secured Wells Fargo website.  No
> signatures are required for this type of elec-
> tronic application, which have [sic] been

9  - FINDINGS & RECOMMENDATIONS

1
2
3
4
5
6
7

> legally valid contracts in the United States for over fifteen years.  Wells Fargo opened the account in good faith and permitted you to use the account to obtain goods and services under the terms of the Customer Agreement and Disclosure Statement (the Agreement).  The account was closed on June 9, 2011 for a non-payment default in accordance with the terms of the Agreement.  The terms and conditions of the Agreement were sent to you at the inception of the account and at every reissue of the card or change in terms as required by law. . . .

8
9
10
11
12
13

> . . . . In addition, you have been provided with a periodic statement every month since the inception of the account which clearly discloses all charges and credits to the account.  Those statements evidence the history of this account.  In the absence of a bona fide dispute, Wells Fargo will not reproduce copies of every statement, since such statements have consistently been sent to you previously.

14 Dkt. #69-9.  Bradley testified in his deposition that based on the
15 bank's computer information, he initially believed the Account had
16 been opened via an electronic application, but he later learned
17 that was incorrect.  Dkt. #68-5, ECF pp. 2-3.  Indeed,
18 Mr. Thomasian testified he opened the Account using a paper
19 application.  Dkt. #68-1, ECF pp. 10-11.  Bradley further explained
20 that in about 2004, Wells Fargo began transferring all of its paper
21 applications to microfiche, but "some of the older records had
22 deteriorated to where they could not be . . . transferred."  Dkt.
23 #68-5, ECF p. 4.

24     Bradley stated he investigated the Account by reviewing
25 computer information that contained "indicators of several pieces
26 of information that were obtained, which indicate[d] to [him] that
27 the customer in this instance was an account holder.  That infor-
28 mation included a name, an address, a date of birth, a Social

10  - FINDINGS & RECOMMENDATIONS

1  Security number, as well as her driver's license [number]."  *Id.*
2  Bradley said if Mrs. Thomasian had only been an "authorized user"
3  of the Account, rather than a co-obligor, then "the only piece of
4  information that would be necessary would be the name, and so that
5  indicated to [him] with that information that the customer was a
6  responsible cardholder."  *Id.*, pp. 5-6.  Bradley further stated as
7  follows:

8          In addition, I believe it was in early
        2001, she contacted the bank to request
9       information about the credit card showing a
        knowledge of the account.
10

11          In addition, our records do not indicate
        any previous request to dispute ownership of
        the account, as the – as the account state-
12      ments and credit cards were sent out in both
        names.  For the previous – I guess that would
13      have been about 11 or 12 years at that time.

14          In addition, the customer was given the
        opportunity, and [was] advised by a represen-
15      tative when she claimed that she was not – she
        should not be on the account, to contact our
16      Fraud Investigations Department to investigate
        the matter, and she had declined or not
17      followed up with that.

18  *Id.*, p. 6.

19      Mrs. Thomasian responded to Bradley's letter on October 26,
20  2011, again asserting she had never used the Account or applied for
21  a credit card account.  Mrs. Thomasian asked if "anyone can apply
22  for a credit card online and use anyone[']s name and make them
23  responsible for the charges?"  Dkt. #69-10.  She again requested
24  proof that she had made charges on the Account or had ever acti-
25  vated a card.  She further stated, "I have not received any state-
26  ments from Wells Fargo and I am not associated with this account in
27  anyway [sic] and I request you remove and clear out my name from
28  your data base."  *Id.*

11  - FINDINGS & RECOMMENDATIONS

1    Karla Velasquez from Wells Fargo's Card Operations Executive
2 Office responded to Mrs. Thomasian's October 26, 2011, letter.  In
3 a letter dated November 2, 2011, Velasquez stated Wells Fargo had
4 already provided Mrs. Thomasian with the information she was
5 requesting (in Bradley's September 26, 2011, letter), and the bank
6 continued to maintain the Account "has been and continues to be
7 reported to the credit bureaus accurately and in accordance with
8 the requirements of the [FCRA]."  Dkt. #69-11.  Velasquez stated
9 further:

> Your letter appears to resemble the charac-
> teristics of an improper "debt elimination"
> attempt.  Accordingly, it is Wells Fargo's
> position that your demand is not being made in
> good faith or pursuant to a bona fide dispute.
> We encourage you to discontinue sending
> letters expressing legally baseless claims.
> Any further correspondence received which is
> similar to that which was recently sent will
> be met with no response and Wells Fargo will
> continue to show the account as outstanding.

16 *Id.*

17    Mrs. Thomasian notified the credit bureaus of her claim that
18 she was not liable for the Account.  Between February and April
19 2012, Wells Fargo received notices of the dispute from each of the
20 CRAs.  In response, Bradley investigated the account as described
21 above, and responded to the CRAs with the same information he had
22 provided to Mrs. Thomasian (i.e., the date the Account was opened;
23 that it was opened "by an electronic application" for which "no
24 signatures are required"; and the date the account was closed).
25 *See* Dkt. #67, ECF pp. 17-18 (citing Dkt. ## 71 through 71-7).
26 Mrs. Thomasian responded to TransUnion and Experian that Wells
27 Fargo's information was inaccurate; she did not activate, sign,
28 access, or use the Account in any way; and her "ex-husband . . .

12  - FINDINGS & RECOMMENDATIONS

filed for bankruptcy in 2011." Dkt. #67, ECF p. 18.  Wells Fargo re-investigated its electronic records, and again responded to the CRAs that Mrs. Thomasian was liable on the Account.  *Id.*, ECF p. 19.

Wells Fargo argues Mrs. Thomasian has "admitted she has no evidence to show she is not an owner of the Account."  *Id.*, ECF p. 20.  She did not contact Wells Fargo's Fraud Department, and "even now does not claim that her husband committed a fraud on her."  *Id.*  Wells Fargo also notes Mr. Thomasian testified he destroyed all of the statements for the Account, and for the Thomasians' joint checking account.  According to Mr. Thomasian, some of these documents were destroyed after Mrs. Thomasian began disputing her liability for the Account, and Mrs. Thomasian knew he was destroying the documents.  *Id.*, ECF p. 22.  Wells Fargo argues "these documents, and any handwritten markings on them that could show charges [Mrs. Thomasian] made or acknowledged on the Account, are not available to Wells Fargo for its defense."  *Id.*

### III.   WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT

Wells Fargo argues it is entitled to summary judgment on several procedural and substantive grounds, each of which is dis-cussed below.

### A.   Delay

Wells Fargo argues Mrs. Thomasian's claims are barred by her delay in disputing her liability for the Account under (1) the FCRA's statute of limitations, (2) Oregon's statute of repose for negligence claims, (3) laches, and (4) equitable estoppel.

13  - FINDINGS & RECOMMENDATIONS

1   *1.   FCRA statute of limitations*

2        Claims "to enforce any liability created under" the FCRA must

3   be brought "not later than the earlier of - (1) 2 years after the

4   date of discovery by the plaintiff of the violation that is the

5   basis for such liability; or (2) 5 years after the date on which

6   the violation that is the basis for such liability occurs." 15

7   U.S.C. § 1681p. The Ninth Circuit has observed that the "dis-

8   covery" rule includes "constructive discovery." *Drew v. Equifax*

9   *Info. Servs., LLC*, 690 F.3d 1100, 1109 (9th Cir. 2012) (citing

10  *Merck & Co. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784, 1794, 176

11  L. Ed. 2d 582 (2010) (discovery rule includes time when a diligent

12  plaintiff could have discovered the facts)).

13       Wells Fargo argues Mrs. Thomasian's claim is based on the

14  bank's allegedly wrongful reporting to the credit bureaus that

15  Mrs. Thomasian is an obligor on the Account. Wells Fargo notes it

16  has been reporting that same information since the inception of the

17  Account in 1999. Therefore, without even entering the quagmire of

18  when Mrs. Thomasian discovered the alleged violation, Wells Fargo

19  argues the alleged violation occurred in 1999, well beyond the

20  five-year limitation period to bring an action based on the alleged

21  erroneous reporting. Dkt. #67, ECF pp. 23-25. Wells Fargo asserts

22  "numerous district courts have already interpreted [the] FCRA's

23  statutes of limitations to run from the [original] publication of

24  the false information." *Id.*, p. 25. Wells Fargo cites three

25  unreported cases in support of this assertion; i.e., *Giles v.*

26  *Capital One Bank*, 2012 WL 3600893 (M.D. Ga. Aug. 21, 2012); *Brian*

27  *M. v. Recontrust Co., N.A.*, 2012 WL 467405 (E.D. Cal. Feb. 13,

28  2012); and *Andresakis v. Capital One Bank (USA) N.A.*, 2011 WL

14 - FINDINGS & RECOMMENDATIONS

1 1097413 (S.D.N.Y. Mar. 23, 2011).  Although each of those cases
2 could support Wells Fargo's position if Mrs. Thomasian were suing
3 for wrongful reporting, that is not the nature of her claims in
4 this case, and none of those cases is relevant to the present
5 inquiry.  Mrs. Thomasian has not brought a claim for wrongful
6 reporting; rather, she has brought claims based on Wells Fargo's
7 alleged actions - or failures to act - once it was made aware that
8 Mrs. Thomasian disputed the reported information.

9     Mrs. Thomasian argues Wells Fargo is attempting "to apply the
10 five-year limitation to non-actionable conduct."  Dkt. #78, ECF
11 p. 12.  She explains that she has brought two FCRA claims against
12 Well Fargo, alleging a violation of 15 U.S.C. § 1681s-2(b), which
13 specifies the "[d]uties of furnishers of information upon notice of
14 [a] dispute."  Mrs. Thomasian alleges Wells Fargo "1) failed to
15 conduct a reasonable investigation of her dispute, and 2) failed to
16 delete information that was 'inaccurate or incomplete or cannot be
17 verified.'"  Dkt. #78, ECF p. 11 (citing *Gorman v. Wolpoff &*
18 *Abramson, LLP*, 584 F.3d 1147, 1154 (9th Cir. 2009) (holding a
19 private right of action exists for willful or negligent noncom-
20 pliance with 1681s-2(b)).  Mrs. Thomasian argues that because Wells
21 Fargo's duties under 15 U.S.C. § 1681s-2(b) were only triggered
22 when the bank received a notice of dispute from a CRA, *see Gorman*,
23 584 F.3d at 1154, "there could be no violation of the FCRA until
24 [Mrs. Thomasian] disputed the account to the CRAs, and [Wells
25 Fargo] failed to perform its duties under Section 1681s-2(b)."
26 Dkt. #78, ECF p. 12.  Mrs. Thomasian filed her first dispute with
27 the credit reporting agencies in 2012, and she brought this action

28

1 in 2013.  Thus, she argues her claims are timely.  *Id.; see id.*,
2 ECF pp. 10-13.

3      The court agrees with Mrs. Thomasian.  For purposes of the
4 five-year limitation, she could not have brought suit for Wells
5 Fargo's alleged failure to conduct a reasonable investigation of
6 her  dispute  until  she  had  actually  initiated  the  dispute.[2]
7 Similarly, for purposes of the two-year limitation, Mrs. Thomasian
8 could not have discovered the nature of Wells Fargo's investigation
9 until  an  investigation  actually  was  made.  Wells  Fargo  argues
10 Mrs. Thomasian could have learned of the allegedly false reporting
11 at numerous instances from 1999 forward.  *See* Dkt. #67, ECF pp. 23-
12 25.  But Mrs. Thomasian is not suing Wells Fargo for allegedly mis-
13 reporting the information *ab initio*.  The violations of the FCRA
14 Mrs. Thomasian alleges are specifically related to the nature of
15 Wells Fargo's investigation *after* Mrs. Thomasian disputed the
16 reported information to the CRAs, and then Wells Fargo's failure to
17 remove the information after allegedly learning the information
18 either was false or could not be verified.  The problem with Wells
19 Fargo's argument is it would allow a creditor to ignore a debtor
20 who brings a reporting error over five years old to the creditor's
21 attention, effectively leaving the debtor without a remedy.

22      Wells Fargo argues the *Drew* decision turns the FCRA's statute
23 of limitations on its head.  The *Drew* court held, in pertinent
24 part, that the two-year limitations period runs from the time the

25 _____

26      [2]Further, to trigger Wells Fargo's duty to investigate under
   the FCRA, it had to receive notice of the dispute directly from a
27 CRA; receiving notice of the dispute from Mrs. Thomasian did not
   trigger a duty to investigate under the statute.  *Drew*, 690 F.3d at
28 1106 (citing *Gorman*, 584 F.3d at 1154).

16  - FINDINGS & RECOMMENDATIONS

consumer discovers the furnisher's failure to comply with the statute by making a reasonable investigation, *not* from the time the consumer learns that allegedly-false information is being reported to the CRAs. *Drew*, 690 F.3d at 1109-11. Wells Fargo argues this is a perverse result, noting that "because a plaintiff is required to file a dispute with a CRA in order to trigger a violation, a plaintiff can wait an unlimited amount of time before ever disputing a furnisher's information and still be timely." Dkt. #67, ECF pp. 23-24. Wells Fargo argues the FCRA was "intended to reduce the burden on furnishers," and prevent them from being "bombarded with lawsuits for every perceived inaccuracy in a credit report." *Id.*, ECF p. 24 (citing *Nelson v. Chase Manhattan Mort. Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002)). Wells Fargo maintains, "It is strange to allow a provision intended to reduce the burden on furnishers to essentially eviscerate the statute of limitations." *Id.* Even if true, this may be the lesser of two evils. Allowing a creditor to refuse to correct false information because it originated more than five years ago would, perhaps, be even more perverse.

The court disagrees with Wells Fargo's interpretation of *Drew*. Under *Drew*, a consumer cannot wait to file a dispute, as described by Wells Fargo, and then sue the furnisher for reporting wrongful information "and still be timely." As discussed above, the FCRA's limitation periods would apply to a tardy claim for wrongful reporting. But when it comes to a claim that a furnisher has made an unreasonable investigation of a dispute, or failed to correct or remove erroneous information after such an investigation, it makes no difference how long the furnisher has been reporting the

allegedly false information before the consumer initiates a dis-
pute.  As long as the furnisher makes a reasonable investigation
upon receiving notice of the dispute, and then acts to correct or
delete any information that is erroneous, the furnisher will have
no liability under the FCRA, even if it has mis-reported the infor-
mation for many years, as allegedly happened here.

The court finds Mrs. Thomasian's FCRA claims have been brought
within the FCRA's statute of limitations.

**2.  *Oregon's statute of repose***

Wells Fargo argues Mrs. Thomasian's "negligence claim" is
barred by Oregon's statute of repose, which "bars any negligence
claim 10 years from 'the act or omission complained of.'"  Dkt.
#67, ECF p. 25 (quoting ORS § 12.115).  However, Mrs. Thomasian has
not sued Wells Fargo for common-law negligence.  Rather, she sues
under a specific provision of the FCRA that provides civil
liability for negligent noncompliance with the Act.  *See* 15 U.S.C.
§ 1681o.  The FCRA's statute of limitations applies to her claim,
rather than Oregon's statute of repose.

However, even if Oregon's statute of repose did apply to
Mrs. Thomasian's claims, as discussed above, "the act or omission
complained of" is Wells Fargo's failure to comply with the FCRA by
making a reasonable investigation of Mrs. Thomasian's dispute, and
failure to correct/delete the allegedly wrongful information. This
is, arguably, a statutory negligence-based claim.  Those alleged
statutory violations occurred well within the ten-year limitation
period in Oregon's statute of repose.

*3.    Laches*

The doctrine of laches "is an equitable defense that prevents a plaintiff, who 'with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'" *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012) (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001)). "To prove laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'" *Id.* (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)).

Wells Fargo argues Ninth Circuit precedents support the view that even when a plaintiff's claims may be timely under the statute in question, the claims still may be barred by laches. Dkt. #67, ECF pp. 26-30. Wells Fargo primarily relies on three cases in which the Ninth Circuit held that for purposes of copyright infringement actions, "the period of delay for laches for a copyright infringement claim runs only from the time that the plaintiff knew or should have known about an actual or impending infringement, not an adverse claim of ownership." *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1032 (9th Cir. 2000); *accord Danjaq*, 263 F.3d at 954; *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 695 F.3d 946, 951-56 (9th Cir. 2012).

In discussing the doctrine of laches as applied to copyright infringement actions, the *Kling* court noted the starting point for laches is not necessarily the same as the starting point for the statute of limitations:

> The statute provides that "[n]o civil action shall be maintained . . . unless it is commenced within three years after the claim

accrued." 17 U.S.C. § 507(b). Applying this statute, the court has held that a "cause of action for copyright infringement accrues when one has knowledge of a violation or is charge-able with such knowledge." . . . But while the statute of limitations is triggered only by violations – *i.e.*, actual infringements – the laches period may be triggered when a plaintiff knows or has reason to know about an *impending* infringement. Judge Learned Hand explained the equitable basis for this dis-tinction:

> It must be obvious to everyone familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed in-fringer spends large sums of money in its exploration, and to intervene only when his speculation has proved a success. Delay under such circum-stances allows the owner to specu-late without risk with the other's money; he cannot possibly lose, and he may win.

> *Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916). Thus a copyright holder would be vulnerable to the laches defense if he had knowledge of a planned infringement more than three years prior to filing his action, even if he complied with the statute of limitations by filing less than three years after the infringement actually began.

*Kling*, 225 F.3d at 1038-39 (citations omitted); *see id.*, 225 F.3d at 1039 n.4 (quoting *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370, 13 S. Ct. 585, 589, 37 L. Ed. 480 (1893), to-wit: "[T]he law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry.").

20  - FINDINGS & RECOMMENDATIONS

1    Relying on this line of cases, Wells Fargo argues
2  Mrs. Thomasian's eleven-year delay in bringing suit, coupled with
3  substantial prejudice to Wells Fargo, should bar Mrs. Thomasian's
4  claims, even if they are timely under the FCRA's statute of limita-
5  tions.  Dkt. #67, ECF pp. 26-30.  Wells Fargo cites one FCRA case
6  in which a court actually considered a laches argument on its
7  merits, finding the defendant had failed to show the plaintiff
8  delayed unreasonably in filing suit.  *See Davis v. Farm Bur. Bank,*
9  *FSB*, 2008 WL 1924247, at *4 (W.D. Tex. Apr. 30, 2008).
10    In response, Mrs. Thomasian argues "common law and equitable
11  affirmative defenses are not applicable to FCRA claims."  Dkt. #78,
12  ECF p. 13.  Mrs. Thomasian has not cited any case, and the court
13  has located none, holding laches is not an available defense to a
14  claim under the FCRA.  She cites FCRA cases where other equitable
15  and common-law defenses have been rejected by the courts:

16    •    *St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881, 882
17         (5th Cir. 1989) (consumer's allegedly "unclean hands" did
18         not prevent him from pursuing FCRA claim)

19    •    *Cole v. Am. Family Mut. Ins. Co.*, 410 F. Supp. 2d 1020,
20         1025 (D. Kan. 2006) (citing *St. Paul Guardian Ins. Co.*,
21         but going further and declining "to hold that the unclean
22         hands doctrine can be used to prohibit a consumer from
23         bringing an action under the FCRA")

24    •    *McMillan v. Equifax Cred. Infor. Servs., Inc.*, 153
25         F. Supp. 2d 129, 131-32 (D. Conn. 2001) (noting "[c]ourts
26         have found that the FCRA does not provide a right to
27         indemnification," citing cases from federal courts in

28

21  - FINDINGS & RECOMMENDATIONS

1       Illinois and California, one of which is also cited by

2       Mrs. Thomasian)

3   •  *Kiblen v. Pickle*, 653 P.2d 1338, 1343 (Wash. Ct. App.

4       1982) ("The FCRA requires consumer reporting agencies to

5       comply with the Act regardless of fraud or misrepresen-

6       tation on the part of the consumer.")

7 Mrs. Thomasian extrapolates from these cases that the equitable

8 defense of laches also is not applicable to FCRA claims.

9    The court finds it unnecessary to resolve the question of

10 whether laches is an available defense to FCRA claims because, as

11 discussed above, Mrs. Thomasian brought this action within a

12 reasonable time after the alleged violations took place.  To

13 belabor the point, she is not suing Wells Fargo for reporting

14 wrongful information to the CRAs in the first place, or throughout

15 the long time period since the Account was opened.  Rather, her

16 claims are based on Wells Fargo's allegedly unreasonable investi-

17 gation after the CRAs informed Wells Fargo of Mrs. Thomasian's

18 dispute, and Wells Fargo's failure to correct/delete the allegedly

19 wrongful information, or at least report that it could not be

20 verified.  Wells Fargo's laches argument fails as to the claims

21 Mrs. Thomasian has asserted here.

22

23 *4.  Equitable Estoppel*

24    Wells Fargo argues Mrs. Thomasian's claims are barred on the

25 ground of equitable estoppel.  Dkt. #67, ECF pp. 30-31 (citing

26 *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir.

27 1970), for the elements of equitable estoppel).  Wells Fargo claims

28 Mrs. Thomasian's "failure to speak when she [had] a duty to do so"

22  - FINDINGS & RECOMMENDATIONS

resulted in Wells Fargo's detrimental reliance on its reasonable belief that Mrs. Thomasian was a joint account holder, allowing "Wells Fargo to continue to extend credit on the basis of [the Thomasians'] joint creditworthiness." *Id.* In other words, Wells Fargo again attempts to prohibit Mrs. Thomasian's claims based on her delay, but by a different route.

Mrs. Thomasian again argues equitable defenses to FCRA claims are not allowed. Dkt. #78, ECF p. 14.

At least one court has held that equitable estoppel "is an insufficient defense in a FCRA case." *Staton v. North State Accept., LLC*, slip op., 2013 WL 3910153, at *4 (M.D.N.C. July 29, 2013). However, as with the defense of laches, the court finds it unnecessary to decide whether equitable estoppel ever can be a defense in an action under the FCRA. The court finds equitable estoppel is an insufficient defense in *this* case because Mrs. Thomasian's "duty to speak" did not arise until the alleged violation for which she sues occurred, and speaking is what she did by filing a dispute with the CRAs that they passed on to Wells Fargo to investigate.


### B.  FCRA Substantive Grounds

Mrs. Thomasian brings her claims under 15 U.S.C. § 1681s-2(b), which provides that once a furnisher of information receives notice from a CRA of a consumer's "dispute with regard to the completeness or accuracy of any information provided by [the furnisher of information] to a consumer reporting agency," the furnisher must take the following actions:

(A)   conduct an investigation with respect to the disputed information;

(B)   review all relevant information provided by the consumer reporting agency. . . .;

(C)   report the results of the investigation to the consumer reporting agency;

(D)   if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E)   if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation . . ., for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly –

(i)   modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).  With regard to the requirement in subsection (A), the Ninth Circuit has held that the furnisher's investigation into the consumer's dispute must be reasonable.  *Gorman*, 584 F.3d at 1155-57 ("We thus follow the Fourth and Seventh Circuits and hold that the furnisher's investigation pursuant to § 1681s-2(b)(1)(A) may not be unreasonable.).

Judge Mosman has explained what a consumer must prove in order to prevail on a claim that a furnisher failed to conduct a reasonable investigation:

Subsection 1681s-2(b)(1) can be enforced by a private plaintiff who establishes: (1) the furnisher of information received notice of the dispute from a credit reporting agency; (2) it failed to perform a reasonable investi-

gation upon receiving such notice; (3) the
failure to investigate was willful or negli-
gent; and (4) plaintiff was harmed.

*Baldin v. Wells Fargo Bank, N.A.*, slip op., 2013 WL 6388499, at *7
(D. Or. Dec. 6, 2013) (Mosman, J) (citation omitted).  However,
nothing in the statute requires the furnisher "to correct informa-
tion simply because the consumer believes it is erroneous," nor
does the statute "create liability for furnishers simply because
the consumer continues to disagree with the conclusion reached by
a furnisher following compliance with § 1681s-2(b)."  *Id.*, at *8.

Mrs. Thomasian brings two claims for relief against Wells
Fargo.  In her First Claim for Relief, Mrs. Thomasian alleges Wells
Fargo "willfully failed to conduct a reasonable investigation" of
her dispute, and "[a]s a result of its investigation, Wells Fargo
continued to report false, derogatory information and allowed the
dissemination of this false information to third parties."  Dkt.
#1, ¶ 12.  Mrs. Thomasian further alleges Wells Fargo "failed to
report the account as disputed by [Mrs. Thomasian] to Experian."
*Id.*  Mrs. Thomasian's Second Claim for Relief alleges Wells Fargo
took the same actions "negligently."  *Id.*, ¶ 19.

Wells Fargo argues it is entitled to summary judgment because
Mrs. Thomasian cannot meet her burden to show Wells Fargo's
investigation was unreasonable, or that the result of its investi-
gation was inaccurate.  Dkt. #67, ECF p. 31 (citing *Chiang v.
Verizon New England, Inc.*, 595 F.3d 26, 37-38 (1st Cir. 2010)
(holding, *inter alia*, that a plaintiff must show "the disputed
information . . . was, in fact, inaccurate,'" quoting *DeAndrade v.
TransUnion LLC*, 523 F.3d 61, 67 (1st Cir. 2008)).

**1.    *Reasonableness of Investigation***

"As *Gorman* explains, an FCRA violation is tied to the reason-ableness of an investigation rather than the accuracy of its results." *Drew*, 690 F.3d at 1110. The *Drew* court elaborated on *Gorman*'s requirement that a furnisher's investigation be reason-able, as follows:

> In *Gorman*, over a furnisher's objection, we held that upon receiving notice of a dispute from a CRA, a furnisher's investigation must be "reasonable." 584 F.3d at 1155-57. In so concluding, we did not hold the furnisher to an impossible standard that rendered it liable anytime its investigation did not reach the correct result. We recognized that factors beyond a furnisher's control may doom the most conscientious investigation to an erroneous result: for example, we noted that in *Gorman*, a CRA had provided the furnisher with "scant information," to carry out the investigation. *Id.* We therefore concluded that the fur-nisher's inaccurate reporting after an inves-tigation was not dispositive proof that its investigation was unreasonable, as despite reasonable efforts, it may not have been given sufficient information to reach the correct conclusion. . . . *Id.* at 1157. In short, "[a]n investigation is not necessarily unrea-sonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccu-rate." *Id.* at 1161. Thus, *Gorman* imposes fault, not for an investigation that produces incorrect results, but for an unreasonable investigation.

*Id.*

The statute itself does not specify what type of investigation is "reasonable." The *Gorman* court found "entirely persuasive" the reasoning of the Fourth Circuit in *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426 (4th Cir. 2004), which noted, among other things, "that the plain meaning of the term 'investigation' is a detailed inquiry or systematic examination, which necessarily requires some

26  - FINDINGS & RECOMMENDATIONS

degree of careful inquiry." *Gorman*, 584 F.3d at 1155 (citing *Johnson*, 357 F.3d at 530; internal quotation marks, additional citation omitted).  The *Gorman* court further observed:

> By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute.  Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete credit reporting." *Nelson [v. Chase Manhattan Mort. Corp.,]* 282 F.3d [1057,] 1060 [(9th Cir. 2002)].  A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry.

*Gorman*, 584 F.3d at 1155-56.

The facts in the *Johnson* case, upon which the *Gorman* court relied, were similar to those in the present case.  An MBNA MasterCard account was opened in November 1987.  The undisputed facts showed that at least one applicant for the account was Edward Slater, a man Johnson married in 1991.  MBNA contended Johnson was a co-applicant and co-obligor on the account, while Johnson claimed she was merely an authorized user of the account.  In 2000, Slater filed bankruptcy.  MBNA removed his name from the account, and notified Johnson that she was responsible for the $17,000 outstanding balance.  Johnson disputed her liability on the account with the three major CRAs.  *See Johnson*, 357 F.3d at 528-29.

The CRAs each sent MBNA an automated consumer dispute verification ("ACDV") to notify MBNA of Johnson's dispute.  The ACDV from Experian stated "CONSUMER STATES BELONGS TO HUSBAND ONLY."  The ACDV from TransUnion stated "WAS NEVER A SIGNER ON ACCOUNT.  WAS AN

AUTHORIZED USER."   The ACDV from Equifax "stated that Johnson disputed the account balance."  *Id.*, 357 F.3d at 429.  "In response to each of these ACDVs, MBNA agents reviewed the account infor-mation contained in MBNA's computerized Customer Information System (CIS) and, based on the results of that review, notified the credit reporting agencies that MBNA had verified that the disputed infor-mation was correct.   Based on MBNA's responses to the ACDVs, the credit reporting agencies continued reporting the MBNA account on Johnson's credit report."  *Id.*

Johnson sued MBNA for failing to conduct a proper investiga-tion of her dispute.  The case went to trial, and the jury found in Johnson's favor and awarded her damages.  MBNA moved for judgment as a matter of law, arguing, among other things, that its investi-gation of Johnson's dispute had been reasonable.   The trial court denied MBNA's motion, and MBNA appealed.   In finding the jury reasonably could have concluded "that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS," the Fourth Circuit observed as follows regarding the evidence in the case:

> . . . MBNA was notified of the specific nature of Johnson's dispute - namely, her assertion that she was not a co-obligor on the account. Yet MBNA's agents testified that their inves-tigation was primarily limited to (1) con-firming that the name and address listed on the ACDVs were the same as the name and address contained in the CIS, <u>FN3</u>/ and (2) noting that the CIS contained a code indi-cating that Johnson was the sole responsible party on the account.   The MBNA agents also testified that, in investigating consumer dis-putes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications. . . .

FN3/    Under MBNA's procedures, agents are only required to confirm two out of four pieces of information contained in the CIS - name, address, social security number, and date of birth - in order to verify an account holder's identity. Johnson's social security number and date of birth were not listed on the CIS summary screen.

MBNA argues that other information contained in the CIS compels the conclusion that its investigation was reasonable. For example, in support of its alleged belief that Johnson was a co-applicant, MBNA presented evidence that Johnson's last name had been changed on the account following her marriage to Slater and that Johnson's name was listed on the billing statements. But this evidence is equally consistent with Johnson's contention that she was only an authorized user on Slater's account and that, to the extent MBNA's records listed her as a co-obligor, those records were incorrect. MBNA also points to evidence indicating that, during her conversations with MBNA following Slater's bankruptcy filing, Johnson attempted to set up a reduced payment plan and changed the address on the account to her business address. However, a jury could reasonably conclude that this evidence showed only that Johnson had tried to make payment arrangements even though she had no legal obligation to do so. Indeed, Johnson testified that, during her conversations with MBNA, she had consistently maintained that she was not responsible for paying the account.

Additionally, MBNA argues that Johnson failed to establish that MBNA's allegedly inadequate investigation was the proximate cause of her damages because there were no other records MBNA could have examined that would have changed the results of its investigation. In particular, MBNA relies on testimony that, pursuant to its five-year document retention policy, the original account application was no longer in MBNA's possession. Even accepting this testimony, however, a jury could reasonably conclude that if the MBNA agents had investigated the matter further and determined that MBNA no longer had the application, they could have at least informed the credit reporting agencies that MBNA could not

1        conclusively verify that Johnson was a co-
         obligor. [Footnote omitted.]
2

3 *Johnson*, 357 F.3d at 431-32 (citation omitted).

4        Mrs. Thomasian's primary objection to the reasonableness of
5 Wells Fargo's investigation is her assertion that all Wells Fargo
6 did "was to compare the identifying information provided by the
7 credit bureaus to the bank's own identifying information (which the
8 bank had provided to the credit bureaus in the first place)." Dkt.
9 #78, ECF p. 15. Mrs. Thomasian cites deposition testimony from
10 Maria Reeves, who, at the relevant time, was "an operations analyst
11 in Wells Fargo's credit bureau disputes department," and "a credit
12 bureau dispute supervisor in the same department." Dkt. #71, ¶ 2;
13 *see* Dkt. #78, ECF pp. 6-9 (quoting relevant portions of Reeves's
14 deposition testimony). Reeves testified regarding Wells Fargo's
15 procedures for responding to ACDVs from the CRAs. She indicated
16 that when the bank performed its investigation in response to the
17 ACDVs from the three CRAs, what Wells Fargo did was verify that the
18 name, Social Security number, and dated of birth in the bank's
19 records matched the same information supplied by the CRAs.
20 According to Reeves, no other information was considered by the
21 bank in performing its investigation. She stated, "Everything is
22 per our system of records, FDR[,]" and as long as those three items
23 matched, the bank would verify the account as accurate. Dkt. #81,
24 ECF pp. 15-16; *see id.*, pp. 12-16. Mrs. Thomasian argues that
25 pursuant to *Gorman* and *Johnson*, Wells Fargo's failure to verify the
26 accuracy of its electronic information was unreasonable.

27        Wells Fargo's responsive arguments, and the evidence upon
28 which Wells Fargo relies, are remarkably similar to MBNA's argu-

30  - FINDINGS & RECOMMENDATIONS

ments and evidence in the *Johnson* case that were rejected by that court. *See* Dkt. #57, ECF pp. 33-37. Wells Fargo argues its investigation was constrained by the specific dispute filed by the consumer, as relayed to Wells Fargo by the CRAs. It argues the CRAs only provided "a restatement of [Mrs. Thomasian's] unsupported denial of liability." *Id.*, p. 35. "Pursuant to its procedures, there being no claim of fraud, Wells Fargo verified that the personal information reported for {Mrs. Thomasian] on the ACDV was accurate and that the customer was liable for the account according to [Wells Fargo's] records." *Id.*, pp. 34-35.

Wells Fargo argues it has "detailed written procedures in place for its employees to investigate and respond to each of the different dispute codes provided by the CRAs." Dkt. #86, p. 8. Wells Fargo maintains that "[n]umerous courts, including several Courts of Appeals and this very Court, have held similar procedures to be reasonable as a matter of law." *Id.* (citing *Cope v. MBNA America Bank, N.A.*, 2006 WL 655742, at **5-8 (D. Or. Mar. 8, 2006 (Brown, J).

The court finds *Cope* is distinguishable for several reasons. In *Cope*, there was no dispute that the plaintiff opened a joint credit card account with her daughter. The plaintiff alleged that when the account was "upgraded" to a Platinum MasterCard some years later, MBNA actually closed the original account and opened a new account, on which the plaintiff was not a co-obligor. The evidence indicated, however, that the plaintiff had made a payment on the allegedly "new" account after it was "upgraded" to a Platinum MasterCard. In addition, the plaintiff had received certain con-tractual disclosures concerning the credit card account putting her

on notice that she would remain liable on the account until all charges were paid in full. Judge Brown found "unpersuasive [Cope's] assertion that MBNA closed and transferred the account and, as a result, that [Cope] was no longer responsible as a joint account holder." *Cope*, 2006 WL 655742, at \*7.

Judge Brown observed that the facts in *Cope* differed from those in *Johnson* "both as to the information provided to [MBNA] in the ACDV forms and as to the investigation [MBNA] conducted." *Cope*, 2006 WL 655742, at \*5. Judge Brown held, therefore, that *Johnson* was not dispositive, and did not estop MBNA from arguing its investigation in *Cope* was reasonable. *Id.* In so holding, Judge Brown specifically observed that in *Johnson*, the CRAs had notified MBNA "of the specific nature of the plaintiff's dispute; *i.e., the plaintiff's assertion that she was not a co-applicant*. The court, therefore, found a jury reasonably could conclude the defendant's investigation, which was limited to confirming that the name and address on the ACDV were the same as in the defendant's records, was unreasonable *because the defendant did not verify the accuracy of the information in its records*." *Id.*, at \*4 (emphasis added; citing *Johnson*, 357 F.3d at 431). The facts in the present case more closely resemble those in *Johnson* than those in *Cope*.

Moreover, *Cope* was decided in 2006, before the Ninth Circuit decided *Gorman*, finding the *Johnson* analysis "entirely persuasive." *Gorman*, 584 F.3d at 1155. Wells Fargo's reliance on *Cope*, and cases from other jurisdictions that predate *Gorman*, is misplaced.

"[S]ummary judgment is usually an inappropriate way to decide questions of reasonableness because of the jury's unique competence in applying the 'reasonable man standard.'" *Saccato v. U.S. Bank*

1  *Nat'l Ass'n, ND*, 2012 WL 169957, at *2 (D. Or. Jan. 17, 2012)
2  (Hogan, J) (quoting *Gorman*, 584 F.3d at 1157); *see Cope*, 2006 WL
3  655742, at *4 ("the question whether 'a defendant's investigation
4  is reasonable is a factual question normally reserved for trial'")
5  (quoting *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827
6  (7th Cir. 2005); additional citation omitted). "'However, summary
7  judgment is not precluded altogether on questions of reasonable-
8  ness.   It is appropriate when only one conclusion about the con-
9  duct's reasonableness is possible.'" *Saccato*, 2012 WL 169957, at
10 *2; *see Cope*, 2006 WL 655742, at *4 ("'summary judgment is proper
11 if the reasonableness of the defendant's procedures is beyond ques-
12 tion'") (quoting *Westra*, 409 F.3d at 827; additional citation
13 omitted).

14      This is not a case where "only one conclusion about [Wells
15 Fargo's] conduct's reasonableness is possible," or its investi-
16 gative procedures are "beyond question."   The court finds a genuine
17 issue of material fact exists regarding whether Wells Fargo's
18 investigation was reasonable, precluding summary judgment.

19

20 *2.   Accuracy of Information*

21      "An item on a credit report is considered incomplete or
22 inaccurate under the FCRA if it is patently incorrect, or because
23 it is misleading in such a way and to such an extent that it can be
24 expected to adversely affect credit decisions." *Boydstun v. U.S.*
25 *Bank Nat'l Ass'n ND*, slip op., 2013 WL 3524693, at *5 (D. Or.
26 June 6, 2013) (Acosta, MJ).   Wells Fargo argues Mrs. Thomasian
27 cannot demonstrate that the bank's information was inaccurate.
28 Wells Fargo points to the evidence already discussed above to

33  - FINDINGS & RECOMMENDATIONS

1  support its claim that the Account was opened as a joint account;
2  Mrs. Thomasian used the Account and was benefitted by it; and
3  Mrs. Thomasian has offered nothing but "inconsistent, self-serving,
4  and unsupported assertions" to prove she never applied for the
5  Account.  Dkt. #67, ECF pp. 31-33.

6      Mrs. Thomasian argues Wells Fargo has lost or destroyed the
7  application for the Account which would have proved conclusively
8  whether or not Mrs. Thomasian ever applied for a joint account.
9  She maintains that without the original application, Wells Fargo's
10 information regarding the Account is "inaccurate or incomplete or
11 cannot be verified," and it should have been deleted from
12 Mrs. Thomasian's credit report.  Dkt. #78, ECF pp. 14-15.

13     Mrs. Thomasian's <u>dispute</u> over the validity of the information
14 "is not equivalent to a factual inaccuracy that must be . . .
15 modified, deleted, or blocked in accordance with subsection (E)."
16 *Baldin*, 2013 WL 6388499, at *8.  As was the case in *Baldin*, "these
17 are the questions at issue in this litigation and vigorously
18 contested by Wells Fargo."  *Id.*  Significant issues of fact exist
19 regarding whether Wells Fargo's records are accurate in showing the
20 Account was, in fact, a joint account.  The court finds these
21 issues of fact must be resolved by the jury at trial, precluding
22 summary judgment for Wells Fargo.

23

24                  *C.  Spoliation of Evidence*

25     The duty to preserve evidence attaches "when a party should
26 know that evidence may be relevant to litigation that is 'antici-
27 pated,' or 'reasonably foreseeable.'"  *PacifiCorp v. Northwest*
28 *Pipeline GP*, 879 F. Supp. 2d 1171, 1188 (D. Or. 2012) (Papak, MJ)

1  (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590, 591
2  (4th Cir. 2001); additional citations omitted). "[A] district
3  court has the discretion to impose sanctions . . . for spoliation
4  includ[ing] dismissal of claims, exclusion of evidence, and adverse
5  jury instructions permitting a jury to draw an inference that the
6  destroyed evidence would have been adverse to the party responsible
7  for its destruction." *Id.*

8      Before the court may impose the harshest sanction of dis-
9  missal, the court must find that the destruction of evidence was
10 "willful." "A party's destruction of evidence is considered 'will-
11 ful' if the party 'has some notice that the [evidence was] *poten-*
12 *tially* relevant to the litigation before [it was] destroyed.'" *Id.*
13 (quoting *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006)
14 (emphasis in original; internal citation omitted).

15     Wells Fargo argues Mrs. Thomasian "knew or should have known
16 of a potential dispute with Wells Fargo when she received the
17 credit card and began receiving account statements in 1999." Dkt.
18 #67, ECF p. 37. Thus, Wells Fargo claims Mrs. Thomasian should
19 have kept all of her account statements, and the credit cards that
20 were issued to her, in anticipation of possible litigation arising
21 from that dispute. *See id.*, ECF pp. 37-38.

22     Wells Fargo argues further that at a minimum, Mrs. Thomasian
23 should have prevented her husband from destroying evidence *after*
24 she began asserting to Wells Fargo that she was not liable on the
25 Account. According to Wells Fargo, Mr. Thomasian testified he
26 destroyed Account statements and other documents after
27 Mrs. Thomasian had initiated her dispute, and that he asked his
28 wife about destroying the documents. *Id.*, ECF p. 38. Wells Fargo

35  - FINDINGS & RECOMMENDATIONS

overstates Mr. Thomasian's testimony somewhat.  Mr. Thomasian testified that he "[n]ever kept any statement of *any* credit cards." Dkt. #68-1, ECF p. 5 (emphasis added).  He destroyed statements and checkbooks from the Thomasians' joint checking account after Mrs. Thomasian initiated her dispute.  *Id.*, ECF pp. 6-8.  He testified it was possible he could have thrown away "copies of bills or receipts or credit card charge records, separate from the statement," but he could not be sure.  As he was disposing of paperwork on his desk, he would ask his wife about things that pertained to her, but otherwise, Mrs. Thomasian did not help in throwing away any records.  *Id.*, ECF p. 8.  Mr. Thomasian did acknowledge that he destroyed one credit card on the Account that had been sent to him bearing Mrs. Thomasian's name, but which "she never activated."  *Id.*, ECF p. 9.  He recalled that the white sticker containing the "800" activation number was still on that card at the time he destroyed it.  *Id.*

Wells Fargo argues Mrs. Thomasian acted willfully in allowing her husband to destroy records that could have proved useful in this case, prejudicing Wells Fargo's ability to defend itself against Mrs. Thomasian's claims. Dkt. #67, ECF pp. 27-39.  Wells Fargo argues anything less than dismissal of Mrs. Thomasian's claims will not cure the prejudice caused by Mrs. Thomasian's spoliation of evidence.  *Id.*, ECF p. 39.

In response, Mrs. Thomasian claims it is Wells Fargo that destroyed the key piece of evidence in the case: the Account application.  Even a microfiche image of the application is not available.  She argues the jury is entitled to hold the

1  unavailability of that application against Wells Fargo.  Dkt. #78,
2  ECF p. 18.

3      From the evidence before the court, the court cannot conclude
4  that either party's spoliation of evidence was willful.  At the
5  time the credit card statements, and the Account application, were
6  destroyed, neither party reasonably would have anticipated that
7  litigation would ensue over liability for the Account.  Although
8  the one credit card and some possible documents destroyed by
9  Mr. Thomasian after the initiation of this dispute potentially
10 could have been relevant to the parties' claims and defenses, the
11 court will leave any inferences to be drawn from their destruction
12 to the jury on a fully-developed evidentiary record.  Specifically,
13 the court does not find sanctions of any kind, much less than harsh
14 sanction of dismissal, should be imposed, at this stage of the
15 proceedings, against either party for spoliation of evidence.

16

17              *D.  "Willful Violation" Claim*

18     Wells Fargo argues Mrs. Thomasian has failed to present any
19 evidence, or even to allege plausible facts, that Wells Fargo
20 violated the FCRA "willfully."  Liability for willfully failing to
21 comply with the FCRA requires a showing of "reckless disregard" for
22 the statute's requirements.  *Safeco Ins. Co. v. Burr*, 551 U.S. 47,
23 56-60, 127 S. Ct. 2209-10, 2216 167 L. Ed. 2d 1045 (2007) (agreeing
24 with the Ninth Circuit's interpretation of this point in *Reynolds
25 v. Hartford Fin. Servs. Group, Inc.*, 435 F.3d 1081 (9th Cir. 2006),
26 but reversing *Reynolds* on other grounds); *see Reynolds*, 435 F.3d at
27 1099 ("[I]f a company knowingly and intentionally performs an act
28 that violated [the] FCRA, either knowing that the action violates

37  - FINDINGS & RECOMMENDATIONS

1  the rights of consumers or in reckless disregard of those rights,
2  the company will be liable under 15 U.S.C. § 1681n for willfully
3  violating consumers' rights.").

4      The evidence of record in this case presents a genuine issue
5  of material fact with regard to whether Wells Fargo's actions were
6  willful.  Reasonable jurors could disagree as to whether Wells
7  Fargo acted in reckless disregard of Mrs. Thomasian's rights in,
8  among other things, failing to report to the CRAs that liability
9  for the Account could not be confirmed once Wells Fargo learned the
10  Account application was no longer available.  Wells Fargo argues
11  Mrs. Thomasian did not provide any evidence that would have led
12  Wells Fargo to doubt the accuracy of its own records.  Wells Fargo
13  demands that Mrs. Thomasian undertake the difficult task of proving
14  a negative.  *Cf. Elkins v. United States*, 364 U.S. 206, 218, 80 S.
15  Ct. 1437, 1444, 4 L. Ed. 2d 1669 (1960) ("[A]s a practical matter
16  it is never easy to prove a negative[.]").  But by the same token,
17  Wells Fargo has presented no evidence that Mrs. Thomasian signed
18  the Account application, or signed any charge slips when the
19  Account was used.

20      The scant evidence in this case leaves only unresolved issues
21  of fact that preclude summary judgment on this issue.  The court
22  cannot find Wells Fargo is entitled to judgment as a matter of law
23  on Mrs. Thomasian's claim that the bank's actions were willful.
24  Accordingly, Wells Fargo's motion for summary judgment should be
25  denied.
26  / / /
27  / / /
28  / / /

38  - FINDINGS & RECOMMENDATIONS

### E.  Motions to Strike

### 1.  Mrs. Thomasian's motion to strike

In her responsive brief, Mrs. Thomasian argues the court should strike the declarations of Carmen Price (Dkt. #70), Lupe Freeman (Dkt. #72), Kathleen DeBeaudry (Dkt. #73), and Latonya Munson (Dkt. #74), offered by Wells Fargo in support of its motion for summary judgment because those four witnesses "were not disclosed during the course of discovery."   Dkt. #78, ECF p. 3. According to Mrs. Thomasian, Wells Fargo never identified these individuals as witnesses.   Mrs. Thomasian propounded an interrogatory to Wells Fargo asking it to "[i]dentify every person who possesses any information pertaining to any facts, claims, defenses or issues in plaintiff's lawsuit."   Dkt. #81, ECF p. 8, Int. No. 5. In response, in addition to asserting the type of boilerplate objections frowned upon by this court, Wells Fargo indicated it would "answer this interrogatory by producing documents in accordance with Rule 33(d) of the FRCP."   *Id.*   Mrs. Thomasian claims Wells Fargo never identified these witnesses in any document production or otherwise.   Dkt. #78, ECF pp. 3-4.   She therefore argues Wells Fargo should not be allowed to use these witnesses' testimony pursuant to Federal Rule of Procedure 37(c)(1).[3]

---

[3] ***Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

1    In response, Wells Fargo claims its failure to supplement its
2  interrogatory answer "was an inadvertent oversight." Dkt. #86, ECF
3  p. 24.  Wells Fargo further argues "the oversight was at most a
4  harmless error, and therefore the motion[] to strike should be
5  denied." *Id.*  Wells Fargo notes Mrs. Thomasian actually deposed
6  Munson, as Wells Fargo's corporate designee. *Id.*, ¶ 2.  It argues
7  its failure to disclose Freeman and Price was harmless because all
8  those witnesses have done in their declarations is to authenticate
9  and interpret documents produced by Wells Fargo during discovery;
10 i.e., the bank's "electronic record of information from the
11 original application." *Id.*, ¶ 3.

12   Regarding DeBeaudry, Wells Fargo claims she was identified in
13 a document produced during discovery "by an abbreviation of her
14 name ('Kath'), her social security number, and branch location."
15 *Id.*, ¶ 4.  Wells Fargo indicates Mrs. Thomasian's counsel asked
16 questions about the document during Reeves's deposition. *Id.*

17   Wells Fargo further notes that pursuant to Federal Rule of
18 Civil Procedure 56(d)(2), Mrs. Thomasian could have asked to depose
19 any or all of those four individuals prior to responding to Wells
20 Fargo's motion for summary judgment, but she failed to make such a
21 request.  *Id.*, ¶ 5.  Wells Fargo further states the parties'

22

23          (A)  may order payment of the reasonable ex-
24               penses, including attorney's fees, caused
                 by the failure:
25          (B)  may inform the jury of the party's
                 failure; and
26          (C)  may impose other appropriate sanctions,
27               including any of the orders listed in
                 Rule 37(b)(2)(A)(i)-(vi).

28 Fed. R. Civ. P. 37(c).

40  - FINDINGS & RECOMMENDATIONS

1  counsel    discussed    the    matter    prior    to    the    filing    of
2  Mrs. Thomasian's response, and Wells Fargo agreed Mrs. Thomasian
3  could depose those individuals prior to filing her opposition, if
4  desired.    According to Wells Fargo, Mrs. Thomasian's counsel
5  indicated "he did not need to take the depositions before filing
6  the opposition, but would do so before trial, and [Wells Fargo]
7  agreed to make the witnesses available." *Id.*, ¶ 6.

8      The court finds Wells Fargo's failure to disclose the four
9  witnesses was, under the circumstances, harmless.    Significantly,
10  the court has not relied on any of those witnesses' testimony in
11  reaching its decision expressed in this opinion.    Wells Fargo
12  referenced Ms. DeBeaudry's declaration in particular during its
13  arguments.    She states she was the person "responsible for
14  obtaining and processing [the Thomasians'] application, and
15  inputting information from their joint application into [Wells
16  Fargo's] electronic computer system in 1999."    Dkt. #73, ¶ 4.
17  Ms. DeBeaudry claims she actually remembers obtaining information
18  from both Mr. and Mrs. Thomasian, and processing their joint
19  application to open the Account.    *Id.*, ¶¶ 6 & 7.    However, Wells
20  Fargo did not have that information available, or rely on it, at
21  the time the bank responded to the ACDVs from the CRAs.    Further,
22  judging the credibility of witnesses is particularly within the
23  domain of the jury, which will have to determine the credibility of
24  Ms. DeBeaudry's claim that she recalls the details of opening this
25  specific Account some fourteen years ago.

26      Mrs. Thomasian's motion to strike the declarations should be
27  denied.

28

**2.    *Wells Fargo's motion to strike***

Wells Fargo asks the court to strike portions of the decla-rations of Mrs. Thomasian and her husband "that are not based on their personal knowledge, are speculative, are contrary to their deposition testimony and/or are otherwise inadmissible as evi-dence." Dkt. #86, ECF p. 6.

The court has not relied on the Thomasians' declarations in making its ruling expressed in this opinion, and Wells Fargo's motion to strike should, therefore, be denied as moot. *See Cope*, 2006 WL 655742, at *3 (denying a similar motion because the court "did not find it necessary to consider" the disputed material in rending its opinion).


### IV.    CONCLUSION

For the reasons discussed above, the undersigned recommends Wells Fargo's motion for summary judgment be denied on all grounds. The undersigned further recommends both parties' motions to strike be denied.


### V.    SCHEDULING ORDER

These Findings and Recommendation will be referred to a district judge. Objections, if any, are due by **April 14, 2014**. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.  If objections are filed, then any response is due by **May 1, 2014**. By the earlier of the response

42  - FINDINGS & RECOMMENDATIONS

due date or the date a response is filed, the Findings and
Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this 25th day of March, 2014.


/s/ Dennis J. Hubel

_____
Dennis James Hubel
Unites States Magistrate Judge

43  - FINDINGS & RECOMMENDATIONS